85 P.2d 748

STATE v. KEENER.

No. 4400.

Supreme Court of New Mexico.

Dec. 19, 1938.

H. B. Hamilton, of Santa Rosa, for appellant.

Frank H. Patton, Atty. Gen., and A. M. Fernandez, Asst. Atty. Gen., for the State.

HUDSPETH, Chief Justice.

The defendant was convicted of statutory rape and asks review upon the sole ground that the evidence was not sufficient to support the verdict.

The defendant, a naturopath, without a license to practise medicine, had been treating the complaining witness, twelve and one-half years old, for a month. He had an office on the main street in the village of Corona. His wife was away on the 31st day of January, 1938, the day the crime was committed. The girl went to his office alone about noon. She was put upon a bed by the defendant. Up to this point there is no material variance in the testimony of the defendant and the complaining witness.

After testifying in detail to the commission of the crime, the complaining witness continued: "so I pulled around and got up. He got up and went in the kitchen, and I went and put on my shoes and coat and started through the other room, and started to go out the door close to that room, and it was locked, then I started out the other one, and he stopped me, and I went to crying, and he said he would call my mother and so he sent somebody after mamma, and then just a little while after that my mother came in * * *"

The mother testified as follows:

"Q. What did you find when you got down to this man's office? A. Well, Jean was sitting on the edge of the bed when I stepped in at the front door, and the doctor was standing right there, and he says 'You will be all right now, your mother is here.' And just·a few minutes afterwards she threw up some of the pink medicine, I presume, because it was pink, and he went in the kitchen and got her a drink, and after she had taken her drink and rinsed her mouth out he took the water back to the kitchen, and I followed him. I didn't like her looks, and I didn't like his appearance either.

"Q. Just explain what you mean? A. She was very pale and her cheeks were purple. He seemed kind of frustrated like he was nervous, and I followed him in there and then he turned around and says: 'I thought you were coming down here with her,' and I told him, 'No, you told me to let her come alone.' He says: 'Why, no, I thought you were coming with her,' and he went ahead explaining then that he had given her that medicine and she had vomited when she came, and he said she fainted, but then I didn't think she was weak enough that morning to faint. I had never seen her faint. I had seen her have exhaustion spells.

"Q. When he was talking to you about her coming down there alone did he say

anything about his wife not being there? A. Yes, he says, 'Why, you know my wife is not here,' and I went on back to Jean then and sat down and watched her. She appeared to be cold, and I said something about it to the doctor, and he got the lamp and told me to warm her up. Still those bumps persisted on her, when I got her warmed, and I presumed they were nervous bumps.

"Q. Go ahead. A. He gave her medicine again at five minutes until one, and he brought the mug there, and turned to me and told me to taste of it. I tasted of it, and he told me to take a big swallow of it, and I took a big swallow of it, and then I told Jean it tasted like peppermint, and go ahead and take it, but she vomited it up a short while afterwards. We stayed there, and he also gave her another dose at two o'clock. She kept it probably thirty minutes, and vomited it up, and then he told her at three o'clock, said 'I will let you go home if you will take those doses of medicine,' and he gave her the dose of medicine, and she grabbed her coat right away, and then he detained me for a few minutes to get some medicine to take home with me, and when I got home I had to build a fire and put her to bed, and she vomited up that dose of medicine also, and she seemed pretty nervous, and I got to thinking about it after I put her to bed. I went in the other room and I was doing a washing, so I was rubbing, and I got to thinking about how every-thing seemed, so I went to questioning her, and I asked her if he treated her wrong, and she said he did, and I had to ask her three or four times what he did, * * * *"

The mother sent a messenger for the father of complaining witness who was on a ranch some 35 miles away. He arrived in Corona about 9 p. m. the same day and immediately reported the crime to the authorities.

The state introduced the evidence of physicians as to the girl's condition shortly after the commission of the crime, but it need not be commented upon. The testimony of the complaining witness is convincing. A long cross examination by able counsel of defendant did not develop a single contradiction. It is not inherently improbable and there is corroboration by the mother, and, up to a certain point, by the defendant himself.

The defendant testified in his own behalf, but the jury did not believe his story. The evidence of the state amply supports the verdict. State v. Ellison, 19 N.M. 428, 144 P. 10; State v. Shults, 43 N.M. 71, 85 P.2d 591.

Finding no error in the record, the judgment of the district court will be affirmed.

It is so ordered.

SADLER, BICKLEY, BRICE and ZINN, JJ., concur.